Sincere gratitude to Chief Judge Connolly of the U.S. District Court for the District of Delaware for loaning us his courtroom, and welcome, counsel. We'll go ahead and call our case today in Re Zostavax, and Mr. Ashman, I'll ask you to come forward. Good morning, Your Honors, and may it please the Court. My name is Howard Bashman, and I represent the plaintiffs' appellants in this matter. With the Court's permission, I'd like to reserve three minutes for rebuttal. This appeal involves a Lone Pine order requiring the production of the impossible, followed by a Rule 41B dismissal order, penalizing plaintiffs for their inability to do the impossible. Based upon the failure- Mr. Bashman? Yes? I am appalled by you talking about Lone Pine orders as an imposition upon plaintiffs. Lone Pine orders are the greatest thing that ever happened to plaintiffs in your kinds of cases, and to have you come in now and complain that, you know, it used to be you could be thrown out of court if you couldn't show proximate cause, right? And a Lone Pine order has instituted an ability to bring a case without being able to show proximate cause, with the caveat that once discovery is completed, you can be required to do so. And that is such a benefit over the way it used to be that I am aghast, I guess that's the word, at your complaining about Lone Pine orders when they're basically the thing that has saved a lot of your business. Judge Roth, as I believe our briefs make clear, plaintiffs do not contend that Lone Pine orders are categorically impermissible. Rather, this appeal challenges a particular Lone Pine order that we believe under this court's precedence and the decisions of other courts crosses the line between what's permissible and what's not permissible. And as I was just... Discovery had been completed, right? Discovery has been completed as to general causation issues only. If you can't do a proximate cause, once discovery is completed, it seems to me you're up the creek. The Lone Pine order did not require the plaintiffs to come in as would be required on summary judgment to demonstrate all of their evidence of specific causation. The Lone Pine order concerned one and only one type of specific causation evidence, which is genetic testing through a PCR test. After four years of litigation and five bellwether trials and there was an opportunity, in fact, more than one opportunity to make the case in a Daubert motion and at the summary judgment motions that were being litigated and despite all of that, it was the impression of a very experienced district court judge that you'd come up empty. Given that our standard of review here is abuse of discretion, right? Why would we look at that and go, oh, there's an abuse? What happened in this case is that there was a decision by the district judge in the five bellwether cases based on the failure of the single expert witness to offer a reliable differential diagnosis that as a result in the remaining 1,189 cases in group A, that the plaintiffs could not prove specific causation unless they possessed genetic virus strain PCR testing of their single shingles rashes. Mr. Bashman, did you come forward with you? You know what I'm talking about. Your clients. I'm sorry. Did the plaintiffs come forward with any indication that they had a capacity to do the differential diagnosis? As I was reading it, I understood the refrain to be, and this was indeed a frustration it appeared to the district court judge, we'll get to it. We'll get to it. We'll get to it. You're going to get it. You'll see it later. And the district court was not impressed with the we'll get to it later. With five bellwethers and summary judgment arguments in those and Daubert motions, the plaintiffs will show you how later seemed to the district court judge to be distinctly inadequate. Why? Why is that an outlandish position for a district court judge to take? You're focusing on the crux of this case, which is what did the Lone Pine order require? The text of the Lone Pine order required production of these PCR tests. And that was it. Is there any evidence at all in these four years that another type of test would show that this particular drug can cause shingles regularly? The issue of what I refer to as general causation is conceded by the other side as to regularly any other type of test. Well, I'm trying to distinguish between general causation and specific causation. So general causation point is, you've established, I think the PCR tests show it. And if you use the PCR tests, the the expert witness was having problems showing the type of differential treatment that that would be needed. But is there any other way to show that this drug causes shingles? The way that plaintiffs intend to show, and I don't represent these 1189 individual plaintiffs at the summary judgment stage, I represent them at this stage. But my understanding of what they intend to show, if they're allowed to go to the summary judgment stage, is evidence through differential diagnosis using a different expert and better evidence than was before the trial judge in the five Bellwether cases. Now, Judge Jordan, you refer to Dahlberg practice, summary judgment, and five Bellwethers. But in fact, that's all one thing. So that all happened in the five Bellwether cases. Mr. Bashman, there has been no showing by any of the plaintiffs of what this other test might be or what it might prove or how it might be done in order to establish specific causation beyond the fact that we know that causation is possible. But specific causation is very important here. And the only way to show specific causation is to have had a test done at the time. And I see nothing in the record to indicate any other possible method of determining specific causation. And you talk about you're going to prove it, but you never say anything. I've received this question several times. Let me try to be as clear as possible. There has been no proceedings in the district court intended to determine whether the plaintiffs, either individually or on a mass basis, can prove specific causation. The trial judge drew this conclusion from the five Bellwether cases only. And to be clear... Hold on, Mr. Bashman, because you just said there's been no determination. Isn't it clear in the district court's order that the court came to understand that only one method had been produced to demonstrate a distinction between the OCA and the wild type strain of the virus? Yes, the district judge came to understand that. But my point is that there were no proceedings. You can't point to anything in the prior history of this case to say, here's the proceeding that is intended to allow the district judge to reach that determination. What's a Daubert motion for? I thought the Daubert motion was specifically designed to do that, to help, to suss out, okay, plaintiffs, how are you going to show specific causation? In those five cases concerning that one expert. Is there the opportunity to say something, anything, about what you're going to do later to say, well, let me ask it this way. In the Paoli case, the Paoli Railroad Yard case, Judge Becker speaks about differential diagnosis. And he says specifically, differential diagnosis involves assessing causation with respect to a particular individual. I take it that's what you're saying here right now, too. Look, here are these thousand plus people, and they're individuals. Differential diagnosis would work for them. So that prompts two questions in my mind. One, if it's so, so individualized, why is this thing an MDL? What's the purpose there? I mean, the only thing you can do is say, well, we'll get to it one by one by one by one. So does the MDL serve any particular purpose? Are you arguing that the court should have said, okay, now I'm going to send these thousand back to the originating districts for them to have differential diagnoses? What's your argument? We believe that at the summary judgment stage, this MDL can begin addressing the question of specific causation in these cases. They could group cases together where the different plaintiffs have similar characteristics. But to go back to, did anybody suggest how that was going to happen? Because as I was looking at this, I started to share Judge Bartle's frustration, which is a promise that we're going to tell you how we'll show specific causation later. We're going to get to it. We're going to get to it. And his- No. Let me try to answer that. It doesn't seem to be, no, you tell me now how you're going to do it. But that's what summary judgment is for. The Lone Pine order says produce PCR evidence. I know of no case where you have a Lone Pine order saying produce a certain type of evidence or diagnostic result. And the cases are thrown out because the plaintiffs failed to come in and show something entirely different from that, which is how are you going to prove specific causation in the absence of that thing? Isn't medical causation one of the classic examples for Lone Pine orders? One of the reasons that they developed in the first place was to say, look, under this new piece of Rule 16c, we're going to, in mass tort cases, we're going to give you a chance to come in and tell us how you're going to show something that could be specific to the class or, in this case, applicable generally across all the MDL cases. If this judge had entered a Lone Pine order requiring the plaintiffs to come in and bring in expert reports saying, here's how we plan to prove specific causation in our cases, I don't think we would be here today because the plaintiffs could have done that. But Mr. Bashman, Mr. Bashman, you keep saying they could have done that, but they were given in briefing and discussion of the Lone Pine order, they were asked, are there alternate ways of finding this out? Are there alternate tests? What is your position? You keep saying, well, that will come where we have it. You've never said what it is. And if the Lone Pine order had given no opportunity to present this other evidence, I can see your point. But the thing is that there was discussion and there was discussion, is there any other test? And you kept saying, well, wait and see, we've got it, but you've never shown what it is. And frankly, I'm skeptical of the fact that you really actually have any alternative means of determining specific causation in the case of shingles of someone who has been vaccinated. This is why Lone Pine orders should be viewed skeptically, because they shortcut the summary judgment proceeding that gives the plaintiffs the procedural protections that the Federal Rules of Procedure provides. ... suggested by Merck followed the five Bellwether trials, did it not? It did. So you can't say that there wasn't some trying of two of those five cases were picked by the plaintiffs. Were there not? I believe that typically six cases were selected and three of them were picked from the plaintiffs was eliminated. I think one of the plaintiff's cases. So two of them were picked by the plaintiffs as the ones that they wanted and that they all came up empty. So then, you know, Merck after four years or three, four years is trying to get an end to this case. And so it requests a Lone Pine order at that point in time. Why would was that in any way incorrect? The reason it was incorrect in the circumstances of this case is, is that it was a pointless exercise because it was known in advance, but nobody had that evidence. And so the case could have gone straight to summary judgment. If Merck's what expert could you possibly put out there that would show some other type of evidence that would show causation? That's what summary judgment is for like a reading, waiting for Godot. No, keep waiting. There's no waiting for Godot. They filed a motion both for a 41 B dismissal and for summary judgment. The parties agreed to stay the summary judgment motion pending the outcome of the 41 B. Well, if this court reverses the summary judgment gets sent back to the district judge who decides how that should proceed. We're not waiting for Godot. We're saying that's how it should be decided. Who, who urged the, the put summary judgment on hold order? The plaintiffs urged that because it's a massive undertaking to have all these 1189 cases go to summary. You, you, you go to the district court after you approach the defendants again, I know it's not you personally, Mr. Bashman, uh, you, you say, put off summary judgment. You suggested to the defendants, they agree to it. You go to the court and say, we'd like to put off summary judgment. And then you come on appeal and say, this was an abuse of discretion because we should have been allowed to go to summary judgment. We made the same argument in opposing the 41 B dismissal in the district court, just because we said, do the 41 B first didn't mean we conceded that, that all these cases should be dismissed under 41 B. There was no fault, but he said, you know what? We want the 41 B first put off the summary judgment. You thought that that would be denied summary judgment, give us 41 B. And then you get an answer on 41 B and you say, wait a second, abuse of discretion. We should have been allowed to go to summary judgment. That just, I don't know, maybe it's just me, but that seems like an unusual response to getting what you wanted. It being here today is not what we wanted. What we want to do. You didn't want to lose having the 41 procedural thing to happen in a certain order. It happened in that order. And now you're complaining that it happened in that order. The decision to let the 41 B go first was not a waiver of our argument that, that the issue should be decided as summary judgment, nor was it a concession that it would be proper to dismiss the cases on, on 41 B was get that disposed of first and, and then have the cases come on on summary judgment. Let me ask one more thing, if my colleagues will indulge me, because we've been circling around this and I'm still not sure we've got an answer. I want to read you something from the district court's opinion and ask you to respond to it. He says on page 12 of the slip opinion, this is the appendix 117. This court as noted above has now presided over the MDL for over four years. There's been extensive discovery and a more than sufficient opportunity for claims to Okay. That's that's judge Bartle making in essence is an assertion of historical fact that, that I've been working this thing for four years and I've, and, and I've given them an opportunity to come forward, not just with PCR testing, but with quote, any, any prima facie evidence of specific causation in the group a cases and, and he's saying they haven't done it. So is that, or is that not a true statement? If that's an inaccurate statement that you did come forward with some prima facie evidence of specific causation, please tell us that and point us to the record where it is. The reason it's an inaccurate statement is that the lone pine order itself only involved PCR testing. And that's true. But I'm not, I'm not asking that. I don't want you to speak to the loan. Okay. I have a second part. My question is very specific. And since we're on some limited time, but you're, we're, you're on our time right now. What answer that specific question, not about the lone pine order, but his assertion that you had not come forward with any prima facie evidence of specific causation problem with his statement in that regard is that he cannot point to any proceeding in which the plaintiffs were required to come forward with that evidence. And as I've been saying repeatedly, that is what summary judgment does. They move for summary judgment, say you can't prove specific causation plans come forward with all their evidence. The district judge looks at that evidence. This court exercises plenary review instead of abuse of discretion review. And that's the way this case should be. I understand your procedural argument, but what I think I'm hearing you say is, yeah, there is nothing in the record that has ever got the opportunity. Well, when you say you never had the opportunity that would require us to believe that competent counsel in the face of the lone pine order and the assertion, bring us PCR testing would not have said your honor. We have these specific pieces of evidence which show prima facie that there's specific causation. We may not have PCR testing, but these are the things we can point to, right? There's no case that didn't happen. There's no case that says that that's what the plant's responsibility is. And that, that I'm not asking that's their responsibility. I'm just asking you like a kindergartner who knocks over a lamp at home and has to come up with an excuse, does not say, well, you didn't ask me that specific question, or I would prefer to wait until sometime later, they come up with their explanation. It's natural human tendency from the very start. So they were in the Daubert stage. They were in the 41B stage. The judge was clearly looking for some way to make a distinction and have specific causation come in to show OCA versus wild type strain of the virus. And what you're telling me is it never came forward because they were waiting for summary judgment. That's the legal position that's being presented to this court, right? At the plaintiffs always asserted that they could prove it at the appropriate stage and it was going to happen. It was going to happen later. Again, the 41B was directed only to the absence of the PCR testing and its revisionist history to say that the plaintiffs were required to come forward with this evidence. The approach you're suggesting elides the entire difference between 41B and Lone Pine and summary judgment, which if the federal rules provide an adequate way to address the issue that's presented here, which unquestionably they do, it should be used instead of some ad hoc procedure that otherwise exists where the rules are inadequate. That's our position. You're plaintiff's counsel and obviously they're practical because you don't want to bring a plaintiff's class action unless you think there's something that can be successful at the end, be it a settlement or a trial. In this case, you would go to the judge and you say, wait a minute, your Lone Pine order talks only about PCR testing. There is other things, there are other things out there that we believe show causation between the drug and shingles. And can you expand the Lone Pine order? Was there an attempt to expand the Lone Pine order? I think that it was plaintiff's position that the Lone Pine order was improper because there were other ways to prove specific causation. Anything out there that you know of, anything at this point that you can tell us besides the PCR test that shows causation between the drug and shingles? The differential diagnosis that I alluded to earlier using different expert witnesses. What expert? Did you ever proffer another expert witness? There has not been the proffer of an expert witness in the case, but if this case goes to summary judgment, then that evidence will be in the record. After four years? I mean... Your Honor, my point is that we don't have to respond to a summary judgment motion that doesn't exist at a time when it's not pending in front of me. Mr. Bashman, if we sent this back with a feeling that there's a futility, that it's not going to go anywhere, then that's not something we're going to do if there is no proof. Now, you haven't asked 50, you and your co-counsel, 50 different ways, what is this evidence? And you just say, well, it will come out in due time. And frankly, for me, that is inadequate. What I've said is that it will be differential diagnosis. There's also an argument that the vaccine strain rash looks different than the naturally occurring rash. And so if people have photographs of their rashes, that could be relevant. You know, again, none of that is in the record, which is why I'm hesitant to refer to it. But our position has always consistently been that we should be given a chance. I'm sorry, I didn't hear the question. I said it is not in the record now. God knows. Does it exist? I think we better hear from the other side. Yeah. Thanks very much, Mr. Bashman. We'll have you back. OK, thank you. May it please the court, Dean of San Giamma for the appellee, Merck, although the court has already essentially done this, I just want to make sure that we define what the scientific issue is that Judge Bartle was addressing in the cases that are here now on this appeal. He issued a Lone Pine order that was addressed at a very specific threshold prima facie issue where we are well familiar with it. So understood. Your Honor, let me ask you to go directly to Mr. Bashman's point, which was, as I understand it, the Lone Pine order was very specific and it asked us to do something which was impossible that everybody acknowledges. Actually, it was impossible. The only way to do the PCR testing is when you got a live shingles case and none of these people, blessedly, had a live shingles case. So the court was asking for something that could not be done and that that's fundamentally erroneous. Like, what's your what's your response to that? Your Honor, I have a two part response to that part scientific part procedural. The scientific response is. That is, in fact, the science that there is no other way to determine whether a given case was caused by the vaccine or not, but there's an important. Hold on. Let's press you on both the the the scientific and the procedural. You know, the on the scientific point, this is the only way to tell their argument is it's the only way to tell definitively. But we don't have to prove 100 percent that this is Oka versus wild strain. We just have to show by a preponderance of the evidence. And we could have done that with differential diagnosis if we'd been given the chance. And so requiring us to show something definitively is contrary to the rules. And it's and it actually, you know, it holds us to a sort of a proof beyond a reasonable doubt criminal kind of case, burden of proof. And that's just wrong. What's your response to that? Judge Bartle was not requiring proof that is definitive. I think the I think the source of that assertion is that this one method, PCR testing, is awfully close to definitive. It's quite good. Are you saying that differential diagnosis is not something that could possibly have worked here? That's correct. Your honor, that that is what I'm saying. And now let me kind of shift over to the procedural point that I don't know yet. Okay. What's your basis for arguing that differential diagnosis? They don't mean Mr. Basham was careful to, as he should be, to not start in on extra record evidence. But he couldn't point to anything in the record because evidently there is nothing in the record that shows that they had prima facie evidence of specific causation through differential diagnosis. There were promises. It's going to it's going to it's going to. But they didn't have anything. Do you have anything that shows in the record they couldn't have done it? They could not have come forward and shown differential diagnosis would work to meet a preponderance of the evidence threshold in a civil case. What we have in the record, your honor, is that the published literature is uniform in saying that you cannot distinguish a rash caused by the case of shingles caused by the vaccine versus the case of shingles that was just naturally occurring just by looking at the rash or you can't distinguish it clinically and that the only way to distinguish it is with the PCR testing. So that was in the record before Judge Bartle. It's in the record now. We also have in the record the fact that there were these five bellwether cases, as as the panel has mentioned, in which there was an attempt to do it by differential diagnosis by the plaintiff's expert without the benefit of any PCR testing. All five of those attempts failed. There was no reliable methodology by which the plaintiff's expert could make the attribution to the vaccine in the absence of that testing. But then there was another important step thereafter. We then filed our motion for a law and pine order after those five bellwether cases had failed. And in that motion, we said to Judge Bartle, look, we have a few pieces of a few indicators here. We have the outcome in the five bellwether cases. And after all, the purpose of bellwether cases in an NBL is to help inform future proceedings. We have that outcome. We also have what's in the published literature. Your Honor, this is what I was referring to a moment ago to this panel. We also have that information. So based on that, our position is, Judge Bartle, our position is that there is no other way to prove it without the PCR testing. And that was the time when the plaintiff should have come forward with some other methodology. When you say that is the time they should have been, go ahead and answer their procedural point, which is that may have been the time when you wanted them to do it. But that wasn't what the order asked them to do. It wasn't it wasn't the summary judgment stage where they were required to come forward with something. And so the judge just pulled the trigger on this too soon. And if I can just supplement that, the argument at times with respect to law and pine orders is that they're an impermissible way of substituting for summary judgment. I think it's important to draw a distinction between motions practice on Merck's motion for entry of a lone pine order and the subsequent motions practice about six months later on Merck's motion for dismissal under Rule 41B. That first motion, the motion for entry of a lone pine order, which followed the Dauber rulings, that was when we were making the case to Judge Bartle. Look, there's no other methodology by which a plaintiff could attribute their shingles to the vaccine. That was the time when the plaintiff should have come forward by saying to Judge Bartle, no, no, no. There is actually another methodology. Here's our publisher literature to support it. Here's our expert declaration to show it. That was the time for them to say, don't enter this lone pine order, Judge Bartle, because we have this other methodology. They didn't do that. So he then entered the lone pine order after them having had the chance to make the case scientifically. And then there was the later step. That does sort of merge into the procedural. They are emphatic in briefing and here at the podium today that procedural protections attend summary judgment that are and they're not around when you're at 41B. We didn't get all these other cases. Judge Jordan, can you speak into the microphone? I can't hear you. Yeah, most people like it better when they can't hear me, Your Honor. But I won't do that. They said we've got commenting. Yeah, we've got we didn't have the facts read in our favor the way we would have with all inferences, reasonable inferences drawn in our favor as we would have at summary judgment. We didn't have the benefit of the discovery we would have had. We would we would have had the benefit on appeal of the noble review instead of abuse of discretion review. These are procedural things that we were entitled to. We didn't get that in and of itself is problematic once you go at that. Your Honor, what we're talking about here is is the entry of a lone pine order under circumstances where the question that was on Judge Bartle's mind, obviously, in the question presented by Merck's motion was not was is there another methodology? It's nothing specific to any one individual plaintiff. It's just is there another methodology which. Well, that's their that's their assertion is it wasn't. Is there another methodology? I take their argument to be he said this is the methodology. Show it or lose. This is it. This is your one shot, this methodology or lose. That's their argument. It wasn't a lone pine order that said come forward and show us prima facie evidence of specific causation. It was show us this kind of specific causation evidence or lose. And that's the problem with the order. That's the point. And I'm maybe doing it inartfully. That's the point I'm trying to get you to answer. Their argument is they put us in a straitjacket and they knew it was a straitjacket that was like Houdini couldn't got out of. It was literally impossible to meet. Now, if that's their argument, why isn't it an abuse of discretion to set somebody a threshold which is literally impossible to meet and then throw them out of court? That's their pitch. I want you to answer it to whatever extent the lone pine order said this is the only way you can do it, do it this way or lose. It only said that after they had the opportunity to try to show him that there was a different way to do it. That's the first part of my answer. The second part of my answer is what point? Because Mr. Bashman, he's a fine advocate. He'll jump up here and say, yeah, what was the procedural point at which we were going to do that? It was naturally summary judgment and we didn't get there. What was the point at which you say they had a chance to do it earlier when they filed their opposition papers to our motion for entry of a lone pine order? That was there. That was a chance. And then if and then if I could go on, then your honor, to speak to the rule. Forty one B motion that followed, as I said, about six months later, it's clear from the transcript of the oral argument. It's clear from Judge Bartle's opinion on the rule. Forty one B order that he was still, even at that stage, entertaining the possibility of them coming forward with published literature or medical evidence of some medical expert, evidence of some sort that would show that there actually was another way. And they didn't do it. They made an attempt to do it at that stage, but but they didn't do it. So that's why, you know, not only do I think there was no abuse of discretion by Judge Bartle, but I would take it a step further and say that this was actually very fair. There were multiple opportunities for plaintiffs to try to show that the published literature is wrong. The scientific community is wrong. Plenty of opportunities for them to show there really is another way to do it. And their main problem is there isn't. But they certainly have the opportunities to show that there was. Can I ask a question, a question which I've been trying to think through? I'm referring you back to the same language from the pale yards case that I quoted to Mr. Bashman, where it talks about differential diagnosis as an individual plaintiff by plaintiff determination. Maybe I should take a step back and ask you this other question first. Do you agree that differential diagnosis is the kind of specific causation evidence that in the past has been found sufficient to allow MDLs to go forward, to allow cases to go forward in an MDL context? Differential diagnosis, if properly done, applying reliable criteria, then yes. Yes. OK. So we've got that as a foundation. And then we have this statement that it's an individual by individual matter. So is there is there something? Well, what do you think would have satisfied or might have satisfied, I'm asking to speculate, Judge Bartle or some other district judge? In other words, I hear them saying we promised we would get the differential diagnosis. We just hadn't. That's so individualized we couldn't really get there yet or something like that. How is it that differential diagnosis can be useful for as a weaving method at the MDL mass to work stage if it's so individualized? Do you understand what I'm trying to ask? I think I do, Your Honor, and I'd like to address that in a couple of ways. The first way is there's a sense in which the cases in this litigation are unique, or at least the cases in which shingles is the alleged injury, because and it's clear from Judge Bartle's writings in this matter that this is of importance to him. All adults, virtually all adults have in them the virus, the varicella zoster virus. That's the virus that when it reactivates will manifest itself as shingles. So for every single plaintiff, every single plaintiff, they are going to face the challenge of needing to rule out that their shingles were just a result of the natural reactivation of the virus. Not only will they face that challenge, but it is known from the literature that the natural reactivation of the virus is far more likely. Were these were these things were these cases dismissed with prejudice? Yes. OK. Was that an abuse of discretion in light of Hammer? No, Your Honor, I don't think it is. And I think Hamer obviously is an important case here. And as you as the premise of Your Honor's question in Hamer, this court said that it was reversible error to dismiss with prejudice. And that it would have been OK to dismiss without prejudice. But the court gave guidance when describing why it was error to dismiss with prejudice. If I could just quote that language. I know the court's familiar with it, but if I could just. I know Judge Roth is familiar with it. All right. Go ahead. All right. The court said. Give me a moment, please. The court said the district court would even have been within its discretion to dismiss Hamer's claims with prejudice, provided that it properly found that Hamer had not stated a claim for relief under Louisiana law. But that is not what happened. The court went on. That is not what happened. The district court dismissed Hamer's claims with prejudice and without any discussion of whether in order to address to allege a redressal injury, the claims must be predicated on proof of an NPM infection. That was the infection issue there. And how is this case different from that? This case is different from that because because Judge Bartle made the finding that a plaintiff cannot make out a prima facie case without this evidence, a plaintiff cannot prove specific causation without this evidence, because after all he had seen, after all the opportunities he had given to the plaintiff to show otherwise, there was no other way of proving specific causation because there was no other way of ruling out the wild type virus. Really, what Merck is saying here is we know we know that our product harmed people. There's some portion of the population that got shingles because of what we did. And I understand that Merck doesn't dispute that, that there's some percentage of the population in whom this live virus in their vaccine actually caused the shingles and caused harm. But nobody's ever going to be able to prove who we hurt, so nobody is ever going to get a measure of recompense for the harm we did. By the way, what is the percentage? Is it 15 percent? No, the plaintiffs had a litigation expert who was claiming 15 percent. Actually, what that expert was claiming is that in 15 percent of the rashes, there was a trace amount of the Evoca strain along with the natural wild strain. The CDC did a study in which they found that the percentage was point one six percent, point one six percent of the shingles cases in people who had received Zostavax were attributable to the vaccine. Some percentage, some percentage may be small, the way Merck says, may be much bigger the way the plaintiffs say. But there's some percentage of the population that Merck's product harmed. And at the end of the day, Merck's position is you can never prove it. So too bad, right? Well, so I don't think that's really quite fair. And let me let me say why. Let me say why. The injury we're talking about here is shingles, which is the condition that the vaccine was intended to prevent, which it does prevent. Yeah, the actual risk of shingles is reduced by a lot of people. But evidently, it hurts some people. And that's what the plaintiffs are complaining about. Well, it did. It hurts. As a judge Amber's question exposed, it hurts that very small percentage of people and larger percentage, if you believe the other side, a larger percentage, if you believe the other side. But the alternative is something that the law submit just would not countenance, which is that plaintiffs would go to trial asking the jury just to speculate that theirs was one of those rare cases or. That the that the individual cases would go back to their districts and under the appropriate state law be tested to see whether they'd done it as opposed to under a blanket order from a district judge in an MDL. Well, your honor, the issue with that is, although there's been references to state law and the importance to evaluate these cases under each plane of state law, there's been no showing of any kind of variation in state law that that would matter for an issue like this. Thank you, Judge Roth. Anything further? There's nothing further. OK, thanks very much, Mr. Sanjama. We'll hear back from Mr. Bashman on rebuttal. I'll be very brief, your honor, because Judge Jordan has done. Yes. Any other methodology is causation in the vaccine and shingles by the PCR. The plaintiffs want to prove it through differential diagnosis. You see, there is. Yes. And what is it? It's having an expert come in, take each individual plaintiff's circumstances, age, other infirmities, the if photographs of the rash exist. Was that known at the time of the summary judgment in the Bellwether trials? Was that known? Yes. So the problem was, that's the case. Why didn't you have a plan B if your offered expert, Dr. Posnanski, was ruled ineligible under Daubert? That's the expert that those plaintiffs chose to use in those cases. I'm saying in case just in case he couldn't find anything under the PCR or anything else, did you have a plan B? You're saying that there is something else you could have, but you don't didn't have an expert. And obviously, you don't want to lose a Bellwether trial. You want to be prepared for anything. Why was there not a plan B? I can't answer that. I'm not I'm not representing those individuals. They aren't part of the appellants before the court. So I'm asking about the trial strategy. I all I know is that that decision was entered in those cases and the appeal is dismissed. And that's the end of those cases. But in these cases, the plaintiffs intend to use different experts and different testimony. And to answer the question that I think is the one thing that's left over from my friend on the other side's presentation, the reason that plaintiffs did not come back in response to the Lone Pine order motion and say, Judge, instead of requiring the PCR testing, you should just enter an order requiring each individual plaintiff to put in all the evidence they have of specific causation, is that each individual each individual plaintiff would have done that. And then none of the cases. Mr. Bashman, Mr. Bashman, Mr. Bashman, and I gather that the plaintiffs had an opportunity to object to the entry of a Lone Pine order. And yet they did not object on the basis that there are other ways to do this. They did. They and if they did, they did not say what those other ways were. And wasn't that the opportunity when they should have come forward with that if it existed after four years of litigation in this case? Plaintiffs did object to the entry of the Lone Pine order. They did say that there are other ways to do it. They did say it should be decided on summary judgment. The four years of discovery that keeps being emphasized involve the issue of general causation, not specific causation. There has not been four years of discovery targeted to specific causation, which is a case specific issue. I just ask you one quick question before we wrap up here, unless my colleagues have other questions. You heard your colleague on the other side say not a word has been uttered about there being a difference in state law here. So we're not under the same circumstances as in Hammer or Hamer, however you say that case name. Do you have a response to that? Yes. First of all, the Hammer decision involved the Lone Pine order that was entered after a global settlement in that case, which is an entirely different scenario. But to answer your Honor's question directly, the reason that individual differences in state law are not part of this record is that that is a summary judgment type of an inquiry. And when Judge Bartle criticized the plaintiffs for bringing it up in the Rule 41B argument to say, you know, that's one of the reasons why this should be decided in summary judgment, we believe that he was just coming too quick to waver. So you brought up the point, but my understanding is you may have said, hey, there's state law, but no differences were pointed to, right? There certainly are plenty of differences in state law with regard to recovery. None were pointed to the district court. The issue before the district court was whether this is the only way to prove specific causation. All right. There are many different ways under state law. If there's other ways. Okay. Thank you, Your Honor. All right. Thanks very much, Mr. Baskin. Thank you, General. We've got the matter under advisement and we'll go ahead and recess court.